Abby J. ROTHBERG, Plaintiff,

v.

LAW SCHOOL ADMISSION COUN-
CIL, INC., a Delaware non-profit
organization, Defendant.

No. CIV.A.04–D–0118(PAC).

United States District Court,
D. Colorado.

Feb. 4, 2004.

Theresa C. Corrada, Isaacson, Rosenbaum, Woods & Levy, P.C., Denver, CO, for Plaintiff.

Lisa Hogan, Brownstein, Hyatt & Farber, P.C., Denver, CO, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

DANIEL, District Judge.

## I. *INTRODUCTION*

Plaintiff's Complaint asserts that Defendant Law School Admission Counsel, Inc. [hereinafter "LSAC"] discriminated against her in violation of Title III of the Americans with Disabilities Act ["ADA"] by failing to provide her reasonable accommodation in connection with taking the Law School Admissions Test ["LSAT"] and by failing to engage in an interactive process with her regarding her requested accommodation. Comp., ¶ 1. The matter now comes before the Court on Plaintiff's Motion for Temporary Restraining Order and for Preliminary Injunction filed January 22, 2004. The motion seeks an injunction ordering that Plaintiff be allowed the accommodation of 50% additional time to complete the LSAT and that LSAC report and certify Plaintiff's score, pending ultimate determination of the merits of Plaintiff's claim.

A hearing was held on the motion for preliminary injunction on Wednesday, January 28, 2004, and evidence was taken. Dr. Thomas M. Griffiths and Dr. Lawrence Allen testified on behalf of the Plaintiff and Ms. Kim Dempsey testified on behalf of the Defendants. The parties submitted Proposed Findings of Fact and Conclusions of Law on Friday, January 30, 2004, and Plaintiff also filed Points and Authorities in Support of Plaintiff's Motion for Preliminary Injunction. Closing arguments were heard on Monday, February 2, 2004.

The Court has reviewed and considered the Plaintiff's Motion for Preliminary Injunction, Defendant's response thereto filed January 27, 2004, the evidence presented at the testimony, the parties' arguments and the proposed findings of fact and conclusions of law and points of authority. For the reasons stated on the record and in these Findings of Fact and Conclusions of Law, Plaintiff's Motion for Preliminary Injunction is granted. Since the Court grants a preliminary injunction, the portion of the motion that seeks a temporary restraining order is denied as moot.

## II. *FINDINGS OF FACT*

1. Abby J. Rothberg ["Plaintiff" or "Ms. Rothberg"] is a twenty-one year old student at Syracuse University. She will graduate in the spring of 2004 and intends to apply for admission to law schools.

2. Defendant LSAC is a private non-profit entity that offers and administers the LSAT, a test required for application to every accredited law school in this country.

3. Ms. Rothberg was diagnosed with a learning disability at an early age.

4. Ms. Rothberg first became aware of her disability when she was in the second grade and could not read, even though her peers could.

5. Ms. Rothberg required one-on-one tutoring to learn to read. She also received tutoring before and after school to keep up with her peers.

6. Ms. Rothberg's learning disability was confirmed by Bruce Pennington, Ph. D., a licensed psychologist, when Ms. Rothberg was in the fourth grade.

7. Ms. Rothberg attended the Campus Middle School, in the Cherry Creek School District, where she was given an Individualized Educational Program ["IEP"] under

the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.*

8. In middle school, Ms. Rothberg required the help of a special education teacher to complete her homework and received additional tutoring. Ms. Rothberg also received unlimited time for testing, and completed her tests with the assistance of a special education teacher.

9. Ms. Rothberg nearly always required a substantial amount of additional time to complete her tests and would often need to finish her tests after school.

10. Ms. Rothberg attended Cherry Creek High School, where she also had an IEP.

11. Ms. Rothberg was evaluated by Elaine Tinter, an Educational Diagnostician and Special Education Teacher.

12. During high school, Rothberg received fifty percent additional time to complete her tests.

13. She was placed in a special education track and given extended time to complete her written work.

14. Ms. Rothberg took the SAT in her senior year of high school. She did not request additional time on the SAT. She obtained a score of 960, which was in the 38th percentile of those who took the test.

15. Ms. Rothberg also took the ACT in her senior year of high school. For this test, she requested and received the accommodation of fifty percent additional time to complete the test.

16. On the ACT, she achieved a score of 25, which was in the 82nd percentile of those who took the test.

17. When Ms. Rothberg entered Syracuse University, she applied for and received specific accommodations of her disability, including fifty percent more time on in-class examinations as well as note-taking services.

18. Syracuse University has provided Ms. Rothberg these accommodations throughout her college education.

19. With these accommodations, Ms. Rothberg has achieved a grade point average of 3.3 out of what I presume to be a total of 4.0.

20. In September 2003, Ms. Rothberg applied to LSAC for an accommodation of fifty percent additional time in taking the October 2003 LSAT.

21. Ms. Rothberg submitted a letter and form to LSAC from Elaine Tinter, who was Ms. Rothberg's case manager for four years at Cherry Creek High School. Pl.'s Exs. 1 and 2.

22. In the form, Ms. Tinter stated that Ms. Rothberg had been diagnosed with a learning disability based on processing speed and recommended fifty percent additional time for the LSAT. Pl.'s Ex. 2. Ms. Tinter stated in her letter that extended time for tests was essential and was the key to Ms. Rothberg's success. Pl.'s Ex. 1.

23. LSAC denied Ms. Rothberg's request because the documentation Plaintiff submitted was incomplete and not current.

24. Plaintiff does not contest that denial.

25. Ms. Rothberg took the LSAT in October 2003 without accommodation.

26. Because of her disability, Ms. Rothberg was unable to read and answer a significant portion of the multiple choice questions and filled in the answer sheet randomly on approximately one-third of the test, as recommended by her Kaplan course of preparation for the LSAT.

27. Ms. Rothberg obtained a score of 148, which was in the 38th percentile of those taking the LSAT. This score is in the low range of average.

28. In October 2003, Ms. Rothberg obtained a neuropsychological evaluation to assess her cognitive functioning and obtain a current recommendation for taking standardized tests, including the LSAT. *See* Pl.'s Ex. 5.

29. The evaluation was done by Thomas M. Griffiths, Ph.D, a clinical psychologist licensed in the state of New York, with significant experience in the area of brain injury and learning disabilities.

30. Dr. Griffiths personally conducted a clinical interview of Ms. Rothberg and administered the Wechsler Adult Intelligence Scale—Third Edition (WAIS III) and the Woodcock–Johnson Tests of Achievement—Revised (WJ–R).

31. Dr. Griffiths found that Ms. Rothberg's performance on the Processing Speed Index of the WAIS III was better than only ten percent of her age-mates, which was in the below average range, while her scores on the Verbal Comprehension Index, Perceptual Organization Index and Working Memory Index were better than 68 to 82 percent of her age-mates, or in the above average range. Ex. 5, WAIS–III Statistical Report—The Psychological Corporation.

32. The Processing Speed Index measures the ability to process simple or routine visual information quickly and efficiently and to quickly perform tasks based on that information.

33. Dr. Griffiths found that the discrepancies between Ms. Rothberg's processing speed scores and her other scores were significant: only 2 percent of individuals from the standardization sample matched or exceeded the discrepancy between Ms. Rothberg's Perceptual Organization Score and her Processing Speed Score; only 8.3 percent matched or exceeded the discrepancy between Ms. Rothberg's Verbal Comprehension Score and her Processing Speed Score; and only 3.1 percent matched or exceeded the discrep-

ancy between Ms. Rothberg's Working Memory Score and her Processing Speed Score.

34. In the Academic Achievement Summary of his report, Dr. Griffiths noted that in addition to her noted weaknesses in number computation abilities, "Ms. Rothberg also presented with relative weaknesses in the area of writing (Writing Samples, Dictation, Proofing, Writing Fluency). Despite her well-developed ability to decode written language, Ms. Rothberg's written encoding skills were clearly impaired when compared with her overall level of intellectual functioning. Her scores on measures of writing consistently fell within the *Borderline* classification when compared with her peers. These discrepancies were consistently near two standard deviations below the mean and below her FSIQ of 108. This pattern of scores is consistent with a diagnosis of Developmental Disorder of Written Expression." Ex. 5, p. 4.

35. In the Test Results Summary of his report, Dr. Griffiths concluded that due to Ms. Rothberg's weak processing speed, she will take "significantly longer to process both verbal and nonverbal material. Hence, she will require more time than the majority of her peers to complete the same volume of material." *Id.*

36. Dr. Griffiths further stated in the Test Results Summary that "[o]n the WJ–R, Ms. Rothberg's scores on individual subtests involving reading skills, as well as on composite scores of these same subtests, clearly reflected well-developed *decoding* of written language." *Id.* at p. 5. "However, significant discrepancies emerged when Ms. Rothberg's scores of measures of number computation skills were compared with her Full Scale IQ, and when her scores on measures of her written expression were compared with her Full Scale IQ." *Id.*

37. Based on test results and his clinical assessment, Dr. Griffiths diagnosed Ms. Rothberg as having "Developmental Expressive Writing Disorder" and "Developmental Arithmetic Disorder". *Id.* He further found that there was "evidence that she experiences significantly slowing of the rate at which she is able to process both verbal and nonverbal information." *Id.* Dr. Griffiths went on to state, "[s]he has clearly not kept pace with either her overall intellectual abilities nor with her reading abilities in these other two areas of academic functioning." *Id.* "These findings are consistent with her previous diagnosis as a student with a learning disability." *Id.* The accommodations she has received throughout high school and college have allowed her to compete with students without learning disabilities, and her GPA is evidence that she has been able to do well with accommodations. *Id.*

38. Dr. Griffiths recommended in his report that Ms. Rothberg receive extended testing time, stating "[i]n light of the weakness of Ms. Rothberg's attentional skills relative to her other, highly developed cognitive skills, it is recommended that she receive double time to complete all standardized and non-standardized tests." *Id.*, p. 5. He also recommended a distraction-free environment. *Id.*

39. LSAC does not dispute that Dr. Griffiths was qualified to render such conclusions and recommendations.

40. Dr. Griffiths' conclusions and recommendations are credible and well-supported.

41. Ms. Rothberg submitted Dr. Griffiths' report, recommendations and testing results to LSAC in November, in connection with her application for the accommodation of 50 percent additional time to take the LSAT.

42. The documentation Ms. Rothberg supplied to LSAC from Dr. Griffiths showed that Ms. Rothberg was substantially limited in her ability to read and process information as compared to others her age and that, without accommodation, her performance on a timed standardized test such as the LSAT would not reflect her actual abilities.

43. In November 2003, LSAC denied Ms. Rothberg's request for accommodation on the December 2003 LSAT for the stated reason that her file was incomplete because she had not supplied the Nelson–Denny Reading Test [NDRT].

44. Dr. Griffiths then sent LSAC an e-mail wherein he stated that he believed "that the results obtain provided clear and convincing evidence of Ms. Rothberg's learning disability even without the NDRT. Although the NDRT may be a valuable instrument in its own right, the evidence from the Woodcock–Johnson was so strong that an additional measure of reading comprehension would have added little to the results." Pl's. Ex. 6. He further stated in the e-mail

I had the opportunity to interview and evaluate Ms. Rothberg personally, and I believe that the results of my evaluation provide more than ample evidence of her learning disability. Ability-achievement discrepancies of the magnitude found in her scores are relatively uncommon and speak volumes regarding her needs. I respectfully request that you reconsider your denial and allow Ms. Rothberg to compete with her peers on a more level playing field.

*Id.* Dr. Griffiths then followed up with a second e-mail that provided more detail as to why he believed that the testing he performed was adequate to show Ms. Rothberg's learning disabilities and why the NDRT was not needed. Pl.'s Ex. 7.

45. LSAC continued to refuse to accommodate Ms. Rothberg on the December 2003 LSAT.

46. After being denied accommodation, Ms. Rothberg opted not to take the LSAT in December 2003.

47. In December 2003, Ms. Rothberg was given the NDRT by licensed psychologist Lawrence Allen, Ph.D.

48. In addition to the NDRT, Dr. Allen conducted several WJ–R subtests, reviewed historical information concerning Ms. Rothberg, and reviewed Dr. Griffiths' report and test results.

49. Based on all of this information, Dr. Allen concurred with Dr. Griffiths' conclusions and recommendations. Specifically, Dr. Allen noted in his Evaluator's Form submitted to LSAC that Plaintiff has "[s]ignificant difficulties in processing speed in math, written language and reading." *See* Pl.'s Ex. 9. Given that, Dr. Allen stated that Ms. Rothberg's prognosis was "poor unless accommodations are provided." *Id.* He recommended in the form that Ms. Rothberg receive fifty percent more time to complete the LSAT. *Id.*

50. LSAC does not dispute that Dr. Allen is qualified to render such conclusions and recommendations.

51. Although the NDRT measures persons in comparison with others in their educational level, Dr. Allen submitted an affidavit that translated Ms. Rothberg's scores on this test to the Normal Curve Equivalent Conversions. *See* Affidavit of Lawrence Allen, Ph.D., attached to Plaintiff's Points and Authorities filed January 29, 2003. He stated therein that Ms. Rothberg's timed vocabulary score is at the 10th "normal curve equivalent," which is "significantly below the average range." *Id.* at ¶ 2. The affidavit further stated that Ms. Rothberg's timed reading comprehension score was in the 29th "normal curve equivalent." which is at the low end of average. *Id.* at ¶ 3. Her total reading score and reading rate score were below average, in the 17th and 13th "normal curve equivalent," respectively. *Id.* at

¶¶ 4–5. Dr. Allen concluded that "[t]hese scores do not change my opinion that Ms. Rothberg is substantially impaired as compared to the average person in her ability to read and process information." *Id.* at, ¶ 6.

52. I find Dr. Allen's conclusions and recommendations to be credible and well-supported. I further find that Dr. Allen's affidavit makes clear that Ms. Rothberg's impairments as they relate to learning and processing information were significantly below average in the general population, and not just as compared to her peers at her educational level.

53. In January 2004, Ms. Rothberg applied to take the LSAT on February 7, 2004, with accommodation, submitting all documentation and test results from both Dr. Griffiths and Dr. Allen.

54. On January 13, 2003, LSAC denied Ms. Rothberg's request for accommodation for the stated reason that her documentation did not demonstrate a substantial impairment related to taking the LSAT.

55. Kim Dempsey is employed by LSAC as a Disabilities Specialist and Manager of Accommodated Testing and testified at the hearing. Ms. Dempsey is responsible for the LSAC's denial of Ms. Rothberg's request for accommodation, and testified at the hearing.

56. Ms. Dempsey is currently working on, but has not yet obtained her Clinical Doctorate, nor is she a licensed Psychologist. Her qualifications thus do not match those of Dr. Griffiths and Dr. Allen.

57. Ms. Dempsey has never met Ms. Rothberg, nor did she personally test or clinically evaluate Ms. Rothberg.

58. Ms. Dempsey reviews approximately 2000 requests for accommodation per year.

59. Ms. Dempsey did not and could not dispute that Ms. Rothberg had the impairments noted by Drs. Griffith and Allen, since she performed no testing or clinical evaluation of Ms. Rothberg. Further, she admitted on the record that she agreed with Dr. Griffiths and Dr. Allen's findings that Ms. Rothberg had learning disabilities. Ms. Dempsey disagreed, however, with Drs. Griffiths' and Allen's conclusions that Ms. Rothberg was substantially impaired as compared to the average person and with their recommendations that she receive more time on the LSAT as an accommodation to her impairments. Ms. Dempsey relied heavily on the fact that Ms. Rothberg was able to perform in the average range on the SAT and LSAT (although in the low range of average) without accommodation.

60. Ms. Dempsey testified that the disabilities diagnosed by Dr. Griffiths and Dr. Allen would not impact Ms. Rothberg's performance on the LSAT because the LSAT does not test mathematics or actual written ability.

61. I reject the opinions of Ms. Dempsey to the extent she disagreed with Dr. Griffiths and Dr. Allen, finding her opinions not to be credible on the issue of disability. I further find that LSAC offered no expert testimony or credible testimony to show that Plaintiff was not disabled consistent with the testimonies, opinions, and reports of Dr. Griffiths and Dr. Allen.

62. More specifically, Dr. Griffiths testified that, based on his testing and clinical evaluation, Ms. Rothberg is substantially limited in the major life activity of reading and processing information as compared to the average person and that the time and a half accommodation is required to place Ms. Rothberg on equal footing with non-disabled test takers. He further testified that this would not give Ms. Rothberg an unfair advantage on the test.

63. Dr. Griffiths also testified that the fact that Ms. Rothberg has not consulted with or been seen by other health care providers over the years related to her impairments is irrelevant since these impairments are a learning disability that she was most likely born with which does not get better or worse depending on treatment.

64. Dr. Allen similarly testified that, based on his testing and clinical evaluation, Ms. Rothberg is substantially limited in the major life activity of reading and processing information as compared to the average person. Indeed, he testified that his testing showed that 96 out of 100 people would process information quicker, and that Ms. Rothberg's processing deficiencies represented lifelong impairment. He also testified that Ms. Rothberg was in the 3rd percentile on vocabulary, the 6th percentile on her reading score, and the 6th percentile on reading fluency on a scale of 100. He concluded that Ms. Rothberg was at a distinct disadvantage when she is under time constraints, that the recommended accommodation is required to place Ms. Rothberg on equal footing with non-disabled test takers, and that this accommodation would not give Ms. Rothberg an unfair advantage on the test.

65. Dr. Griffiths and Dr. Allen stressed the importance of clinical evaluation, which includes a thorough review of all available information, including the subject's history, to accurately diagnose a disability. Dr. Griffiths' and Dr. Allen's clinical evaluations demonstrated that Rothberg's processing impairment significantly impairs her ability to process information as compared to the average person and that, because of her disability, Ms. Rothberg requires significantly more time than the average person to perform tasks that involve the processing of information.

66. I find the opinions and recommendations of Drs. Griffiths and Allen to be more credible than the opinion of Ms. Dempsey as to the issue of Ms. Rothberg's impairments.

67. In that regard, I find that there is evidence in the record from Dr. Griffiths and Dr. Allen that allows me to conclude that Ms. Rothberg's processing speed is below those in the general population and the average person. I further find that, without accommodation, Ms. Rothberg scores on timed tests such as the LSAT, which I find require the ability to process information efficiently, will not accurately reflect her aptitude or achievement level.

68. Further, as to the October 2003 LSAT, I find that because Ms. Rothberg received no accommodation, it is more likely than not that her score on that LSAT does not accurately reflect her abilities.

69. If Ms. Rothberg is allowed to take the LSAT with accommodations, she will have an opportunity to demonstrate her true abilities unimpeded by her disability.

70. For non-standard time scores, LSAC advises law schools that the score was achieved with accommodations and "should be interpreted with great sensitivity and flexibility"; thus, law schools will be able to give the accommodated score whatever weight they deem appropriate.

71. In addition LSAC reports such scores individually, and does not average them with other scores. LSAC also does not report the percentile ranks of nonstandard-time scores.

72. Thus, granting Ms. Rothberg accommodations will not destroy the integrity of the LSAT or unfairly advantage her over other law school applicants.

## III. CONCLUSIONS OF LAW

### a. Jurisdiction and Venue

1. This court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and § 1343(a)(4). Venue is proper pursuant to 28 U.S.C. § 1391(b) and (c).

### b. Standard for Preliminary Injunctive Relief

2. Ms. Rothberg seeks a preliminary injunction requiring LSAC to administer the LSAT to her on February 7, 2004, with the accommodations she seeks.

3. Ordinarily, a party seeking a preliminary injunction must show: (1) the movant will suffer irreparable injury unless the injunction issues; (2) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction would not be adverse to the public interest; and (4) there is a substantial likelihood that the movant will succeed on the merits. *Walmer v. U.S. Dept. of Defense*, 52 F.3d 851, 854 (10th Cir.), *cert. denied*, 516 U.S. 974, 116 S.Ct. 474, 133 L.Ed.2d 403 (1995); *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir.1991).

4. Where the requested relief alters the status quo, is mandatory instead of prohibitory, or affords the movant substantially all of the relief he may recover at the conclusion of a full trial, a movant must ordinarily demonstrate that the four factors described above weigh "heavily and compellingly" in favor of the injunction. *SCFC*, 936 F.2d at 1098–99.

5. Although the relief requested by Plaintiff arguably fits within one or more of the above categories, courts have held that the heightened standard for injunctive relief does not apply where a plaintiff is seeking injunction for the purpose of enforcing a statute designed to protect the public. *See United States v. Rx Depot, Inc.*, 290 F.Supp.2d 1238, 1246–48 (N.D.Okla.2003) (distinguishing dispute between private litigants from relief sought under a statute designed to protect the

public, where an action can be brought only after the law is broken, and not applying the heightened standard).

■ 6. The parties have not cited any case in the Tenth Circuit that has applied the heightened standard set forth in *SCFC* in the context of a request for injunctive relief under a civil rights statute. Moreover, courts in this circuit have not applied the heightened standard in the ADA context, despite the fact that the plaintiff was seeking relief that did not preserve the status quo. *See, e.g., Keirnan v. Utah Transit Authority,* 339 F.3d 1217, 1220–22 (10th Cir.2003) (plaintiff seeking an order to cause transit authority to suspend its rule prohibiting transporting oversized wheelchairs); *Pahulu v. University of Kansas,* 897 F.Supp. 1387, 1389 (D.Kan. 1995) (plaintiff seeking order requiring university to permit him to play football). Accordingly, I decline to adopt the heightened standard because I find that would be antithetical or contrary to the fact that the ADA is a remedial statute.

■ 7. Moreover, the Tenth Circuit holds that where a statute authorizes the issuance of injunctive relief, "the discretion of the trial court in issuing or withholding an injunction is to be 'exercised in light of the objectives of the Act.'" *Atchison, Topeka and Santa Fe Railway Co. v. Lennen,* 640 F.2d 255, 258 (10th Cir.1981) (quotation omitted). In that situation, "[t]he court is to be guided by the primary objectives of the statute involved, using public interest standards rather than private litigation requirements." *Id.* at 258–59. It is not necessary in such a circumstance for the plaintiff to show irreparable injury or inadequacy of legal remedies. *Id.* at 259; *see also Mical Communications, Inc. v. Sprint Telemedia, Inc.,* 1 F.3d 1031, 1035 (10th Cir.2003).

8. The ADA authorizes injunctive relief. Indeed, the only remedy available under Title III of the ADA, the provision

plaintiff is suing under, is injunctive relief. Specifically, the ADA states that "[t]he remedies and procedures set forth in section 2000a–3(a) of this title are the remedies and procedures this subchapter provides to any person who is being subjected to discrimination on the basis of disability in violation of this subchapter or who has reasonable grounds for believing that such person is about to be subjected to discrimination in violation of section 12183 of this title." 42 U.S.C. § 12188(a)(1). The remedies provided therein include injunctive relief. As to injunctive relief, the statute provides:

> In the case of violations of sections 12182(b)(2)(A)(iv) and section 12183(a) of this title, injunctive relief shall include an order to alter facilities to make such facilities readily accessible to and usable by individuals with disabilities to the extent required by this subchapter. Where appropriate, injunctive relief shall also include requiring the provision of an auxiliary aid or service, modification of a policy, or provision of alternative methods, to the extent required by this subchapter.

42 U.S.C. § 12188(a)(2).

■ 9. I find that, although there is no Tenth Circuit case on point, it is likely that the Tenth Circuit would find that the ADA's statutory provision authorizing the issuance of an injunction dispenses with the requirement of proof of irreparable injury. In reaching this conclusion, I note that the purpose of the ADA is to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1); *see also PGA Tour, Inc. v. Martin,* 532 U.S. 661, 674, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001) (Congress enacted the ADA to remedy widespread discrimination against disabled individuals). Plaintiffs such as Ms. Rothberg are,

in effect, acting as private attorneys general in vindicating a policy that Congress considered of the highest priority. *Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 402, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968); *see also Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.,* 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001) (persons who bring civil rights claims serve as private attorney generals).

10. I further find that to apply a "heightened standard" every time an ADA plaintiff seeks an accommodation under Title III would lessen the effectiveness of the statutory remedy of preliminary injunctive relief that Congress afforded plaintiffs under the ADA, frustrate the vindication of important public policy and protect illegal discrimination. Thus, I decline to apply the heightened standard set forth in *SCFC* in the particular circumstances of this case, and find that Ms. Rothberg is not required to show irreparable harm since she is seeking an injunction authorized by statute. However, I also find for the reasons stated below that even if Ms. Rothberg is required to show irreparable injury, she has made such a showing.

i. *Substantial likelihood of success on the merits.*

11. I first address applicability of the ADA to Defendant LSAC and the testing at issue. Title III of the Americans with Disabilities Act ("ADA") requires private entities that administer examinations such as the LSAT to offer the examinations or courses in a manner accessible to persons with disabilities. 42 U.S.C. § 12189; 28 C.F.R. § 36.309.

12. Private entities who administer such tests are required to provide testing accommodations for persons with both physical and mental disabilities to ensure that "the examination results accurately reflect the individual's aptitude or achieve-ment level," rather than the disability. 28 C.F.R. § 36.309(b)(1)(i); see also *Gonzales v. National Board of Medical Examiners,* 225 F.3d 620, 625 (6th Cir.2000), *cert. denied,* 532 U.S. 1038, 121 S.Ct. 1999, 149 L.Ed.2d 1002 (2001).

13. It is undisputed in this case that LSAC is an entity covered by Title III of the ADA. Such an entity discriminates against a disabled individual when it fails to make "reasonable accommodations to known physical or mental limitations" in connection with testing. 42 U.S.C. § 12112(b)(5)(A).

14. Having found that LSAC and the testing at issue are covered by the ADA, I next address what Plaintiff must show to demonstrate a substantial likelihood of success on her claim. Courts that have considered this issue in the context of testing accommodations hold that the plaintiff demonstrates a substantial likelihood of success where she shows: "(1) that she is disabled; (2) that her requests for accommodations are reasonable, and (3) that those requests have been denied." *D'Amico v. New York State Bd. of Law Examiners,* 813 F.Supp. 217, 221 (W.D.N.Y.1993); *see also Ware v. Wyoming Bd. of Law Examiners,* 973 F.Supp. 1339, 1356 (D.Wyo.1997), *aff'd,* 161 F.3d 19 (10th Cir.1998).

15. LSAC does not dispute that Plaintiff has established the second and third elements. Specifically, LSAC has not disputed that it is obligated to provide reasonable accommodations, including extra time, if a person has a disability under the ADA. *See* 28 C.F.R. § 36.309(b)(2). LSAC's own rules and procedures contemplate the accommodation of persons with learning disabilities, including extra time to complete the test.

16. LSAC also has not disputed that the particular accommodation Ms. Rothberg requests is a reasonable accommoda-

tion if required by a disability or an impairment covered under the ADA. Indeed, the regulation at issue specifically authorizes the accommodation sought by Plaintiff of extra time, stating "[r]equired modifications to an examination may include changes in the length of time permitted for completion of the examination and adaptation of the manner in which the examination is given." 28 C.F.R. § 36.309(b)(2); *see also Gonzales*, 225 F.3d at 626. LSAC admitted that it routinely gives extra time to complete the test to persons who have established that this accommodation is required by a disability. Even if LSAC had disputed the particular accommodation sought by Plaintiff, I find that this accommodation is supported by the testimony and findings of Dr. Griffiths and Dr. Allen, and there is no evidence that such accommodation is not reasonable in light of Plaintiff's impairments.

17. It is also undisputed that LSAC denied the requested accommodations to Plaintiff.

18. Accordingly, whether Plaintiff has demonstrated a substantial likelihood of success turns on whether Plaintiff has shown that she is disabled.

19. To demonstrate that Plaintiff is disabled, Ms. Rothberg must show that (1) she has a physical or mental impairment that substantially limits one or more of her major life activities, (2) the life activity impaired is a major life activity; and (3) the specified impairment "substantially limits" the major life activity. *Bragdon v. Abbott*, 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998).

20. The phrase "physical or mental impairment" means "[a]ny mental or psychological disorder such as . . . specific learning disabilities." 28 C.F.R. § 35.104 (1999).

21. In this case, I find from the undisputed evidence that Plaintiff's learning disabilities, including the impairment related to processing of information, are mental impairments.

22. I also find that Ms. Rothberg's learning disabilities, and more specifically her impairment related to processing information, impact the major life activity of reading and learning as demonstrated by the findings, conclusions and testimony of Dr. Griffiths and Dr. Allen. *See Doyal v. Oklahoma Heart, Inc.*, 213 F.3d 492, 496 (10th Cir.2000) (learning is a major life activity); *Bartlett v. New York State Bd. of Law Examiners*, 226 F.3d 69, 80 (2nd Cir. 2000) (reading is a major life activity).

21. The real dispute in this case is whether Plaintiff's impairments "substantially limit" the major life activities of reading and/or learning. "Substantially limits" means "[s]ignificantly restricts as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii).

22. On the totality of the evidence, including the opinions of two experts in the area of learning disabilities (Dr. Griffiths and Dr. Allen) and Plaintiff's history of a significant learning disability, I find that Ms. Rothberg has shown that she is substantially limited in the major life activity of learning and reading, and more specifically, the processing of information required to learn and read. I find that the evidence clearly shows that Ms. Rothberg cannot read and process information in the condition, manner or duration under which the average person can perform that activity.

23. I reject LSAC's argument, testified to by Ms. Dempsey, that Plaintiff is not substantially limited in the major life activities of learning or reading because she is within the average range in reading com-

prehension and other aspects of reading discussed in Drs. Griffiths' and Allen's reports.[1] I adopt the reasoning of the Second Circuit in *Bartlett* in making this decision.

24. *Bartlett* rejected the district court's decision that the plaintiff was not substantially limited with respect to reading "because the court did not apply the correct legal standard." *Id.*, 226 F.3d at 81. In particular, the Second Circuit noted that the district court "relied on its finding that Bartlett had achieved 'roughly average reading skills (on *some* measures) when compared to the general population.'" *Id.* The Second Circuit then held that, "[i]t is not enough that Bartlett has average skills on 'some' measures if her skills are below average on other measures to an extent that her ability to read is substantially limited." *Id.* Upon remand, the district court found that plaintiff was "substantially limited in the major life activity of reading when compared to the average reader", applying this new standard. *Bartlett v. New York State Bd. of Law Examiners*, No. 93 CIV. 4986(SS), 2001 WL 930792 at *3 (S.D.N.Y.2001).

25. In the case at hand, Plaintiff's experts testified that although Ms. Rothberg's learning and reading skills are average or even above average in some areas, she is substantially limited in her ability to process information as compared to the average person. Dr. Griffiths found that with these processing difficulties, Plaintiff will require more time than the majority of her peers to complete the same volume of material.

26. I find that this impairment impairs Plaintiff's ability to take the LSAT, and that without accommodation, the examination results will not accurately reflect her aptitude or achievement level. The LSAT is a timed test, involving extended periods of reading and processing information. Both Plaintiff's expert psychologists who examined and tested Ms. Rothberg, testified that her processing impairment would affect her performance on the LSAT, and that the accommodation requested was required to show Plaintiff's true abilities and to place her on a level playing field with other applicants.

■ 27. The purpose of the ADA is to guarantee that those with disabilities are not disadvantaged and "to place those with disabilities on an equal footing" with others. *D'Amico*, 813 F.Supp. at 221; *Rush v. National Board of Medical Examiners*, 268 F.Supp.2d 673 (N.D.Tex.2003). Moreover, the law requires that exam be given in such a way that it accurately reflects a person's aptitude or achievement level, rather than her impairment or disability. 28 C.F.R. § 36.309.

28. Accordingly, I find that Ms. Rothberg has demonstrated a substantial likelihood of success. *See Rush*, 268 F.Supp.2d at 678–79; *Agranoff v. Law School Admission Council, Inc.*, 97 F.Supp.2d 86, 87–88 (D.Mass.1999); *Badgley v. Law School Admission Council, Inc.*, 2000 WL 33225418 (N.D.Tex.2000); *Bartlett*, 2001 WL 930792 at *43.

29. LSAC argues, however, that the fact that Rothberg has been able to achieve average scores on standardized tests such as the SAT and LSAT without accommodation shows that she is not disabled under the ADA. I reject this argument.

---

1. Ms. Dempsey also relied on testing performed of Ms. Rothberg in high school by Elaine Tinter in justifying LSAC's decision that it was not required to accommodate Plaintiff. I find reliance on such testing to be disingenuous in light of LSAC's own guidelines which state that LSAC looks only at the current condition of an applicant in making a decision as to whether to grant accommodation.

30. The district court's decision in *Bartlett* is instructive. In that case, the defendants contended that the plaintiff could not have a reading deficiency because, among other things, plaintiff scored within average on the LSAT, GRE and SAT without accommodations. The problem with that analysis according to the court was that it relied "on quantitative outcomes alone." *Bartlett,* 2001 WL 930792 at *37. *Bartlett* noted that the ADA required that the court examine the manner in which plaintiff achieved each of these outcomes in determining whether plaintiff's impairment substantially limited her reading. *Id. Bartlett* concluded, "[a] definition of disability based on outcomes alone, particularly in the context of learning disabilities, would prevent a court from making a finding of disability in the case of any individual like Dr. Bartlett who is extremely bright and hardworking, and who uses alternate routes to achieve academic success." *Id.*

31. In this case, Plaintiff testified that she was unable to complete approximately 1/3 of the LSAT because of her processing impairment. She further testified that she relied on strategies learned during her preparation for the LSAT to compensate, including randomly filling in the blanks on the multiple choice questions. This strategy helped her increase her score as some of those answers turned out to be correct. From the foregoing, I find that the manner in which Plaintiff took the test showed that her processing impairments substantially affected her ability to read and take the test, but that she compensated for those impairments and achieved an end result that was within the low range of average. *See id.* at *39 ("the method plaintiff used to score in the average range on the LSAT is also consistent with the other evidence of disability" where she used skills taught in a preparatory course to compensate for her deficiencies). Plaintiff's ability to compensate for her deficien-

cies does not support a finding that Plaintiff is not substantially impaired, and I will not penalize Plaintiff for her compensation abilities.

ii. *Irreparable injury*

 32. I first find as to irreparable injury that LSAC has engaged in a prohibited act under the ADA by denying Ms. Rothberg's request for reasonable accommodation. Under Tenth Circuit authority, Plaintiff is thus not required to demonstrate any additional irreparable injury. *Mical Communications,* 1 F.3d at 1035; *Lennen,* 640 F.2d at 259.

 33. Even if Plaintiff is required to demonstrate a specific injury other than the ADA violation, I find that she has done so. If Ms. Rothberg is required to wait until a full trial on the merits, any relief granted at that time will likely be moot, as she will have already applied to law schools using her October score, and will have been deprived of the opportunity to demonstrate her true abilities, unimpeded by her disability.

34. Further, Ms. Rothberg is simply asking that she be allowed to take the LSAT on a level playing field with persons who do not have the learning and processing impairments that she has. She cannot achieve a level playing field unless LSAC allows her to take the examination with accommodations. Compensatory damages will provide no relief if Plaintiff is denied such accommodation. *See Keirnan,* 339 F.3d at 1220 (irreparable injury shown where damages might not be available should a court later find in plaintiff's favor); *Prairie Band of Potawatomi Indians v. Pierce,* 253 F.3d 1234, 1250 (10th Cir.2001) (an injury is irreparable if it cannot be compensated in monetary damages).

### iii. *The balance of harm favors the injunction.*

35. I find that the threatened injury to Ms. Rothberg, as described above, substantially outweighs any injury that injunctive relief will cause LSAC. There is evidence that LSAC routinely grants accommodations when a person is found to have a disability that impacts their abilities on the LSAT. Further, there is no evidence that it would be a hardship for LSAC to provide the requested accommodations for Ms. Rothberg in this case.

36. In addition, I find that the relief sought will not jeopardize the integrity of the LSAT, since Ms. Rothberg's accommodated score will be reported separately from regular test scores, and the law schools will be advised that Ms. Rothberg received extra time. I have also permitted LSAC to note in connection with reported scores to law schools that the LSAT was given to Plaintiff with accommodations pursuant to a court order.

### iv. *Public Interest*

37. I find that LSAC has not shown that injunctive relief is adverse to the public interest. Indeed, I find to the contrary. Specifically, I find that the injunction furthers the strong public interest of requiring persons with disabilities to be accommodated as required by the ADA.

### v. *Issuance of Bond*

38. Fed. R.Civ. P. 65(c) requires that the Court impose a bond before granting a preliminary injunction. Here, however, both parties have agreed that no bond should be imposed because of the nature of the relief that is being sought. Accordingly, I will not impose a bond.

### IV. *CONCLUSION*

Based on the foregoing, I find that Ms. Rothberg has satisfied all of the requirements necessary to obtain a preliminary injunction, and that she is entitled to the requested accommodations on the LSAT. Accordingly, it is

ORDERED that Plaintiff's Motion for Preliminary Injunction filed January 22, 2004, is **GRANTED**. In accordance therewith, it is

ORDERED that LSAC shall give Plaintiff the accommodation of 50 percent additional time to complete the LSAT commencing on February 7, 2004. Thus, as to those portions of the test that are 35 minutes in length, Plaintiff shall be given 53 minutes to complete these portions. As to those portions of the test that are 30 minutes in length, Plaintiff shall be given 45 minutes to complete these portions. It is

FURTHER ORDERED that LSAC shall provide Plaintiff an environment to take the LSAT in which she is not distracted by persons who are required to complete the examination in the standard time. It is

FURTHER ORDERED that in light of the fact that Plaintiff was granted a preliminary injunction, Plaintiff's Motion for Temporary Restraining Order filed January 22, 2004, is **DENIED AS MOOT**.